SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-03-0247-AP |
| Appellee, | ) | |
| | ) | Yavapai County |
| v. | ) | Superior Court |
| | ) | No. CR 2001-0177 |
| HOMER RAY ROSEBERRY, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Yavapai County
No. CR 2001-0177
The Honorable William T. Kiger, Judge

**CONVICTIONS AND SENTENCES AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
    by   Kent E. Cattani, Chief Counsel
         Capital Litigation Section
    and  Jon G. Anderson, Assistant Attorney General
Attorneys for Appellee

DUCAR, LORONA & PARKS, P.C.                                Phoenix
    by   Jess A. Lorona
    and  Gregory E. McClure
Attorneys for Appellant

_____

**B E R C H**, Justice

¶1      Appellant  Homer  Roseberry  was  found  guilty  of
transportation  of  marijuana  for  sale,  conspiracy  to  transport
marijuana for sale, and the first-degree murder of Fred Fottler.
The jury sentenced him to death for the murder.

¶2     Appeal to this court is direct and automatic when a sentence of death has been imposed. Ariz. Rev. Stat. ("A.R.S.") § 13-703.04 (Supp. 2004); Ariz. R. Crim. P. 26.15, 31.2(b). This court has jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution, A.R.S. § 13-4031 (2001), and Arizona Rule of Criminal Procedure 31.2(b).

## I.   FACTS[1]

### A.   Drug Transportation and Murder

¶3     In 1997, on a trip to California in their motorhome, Roseberry and his wife, Diane, met members of a marijuana-smuggling ring known as the Pembertons. In late 1998 and early 1999, Roseberry was paid by the Pembertons to transport three loads of marijuana in his motorhome from Arizona to Michigan.

¶4     In early October of 2000, Roseberry agreed to transport more than one thousand pounds of marijuana. When Roseberry arrived in Phoenix to pick up the load, the Pembertons informed him that Fred Fottler would accompany him to protect the goods. Several large duffle bags of marijuana were then loaded into the motorhome.

¶5     On October 20, 2000, Roseberry set off from Phoenix. At that point, pursuant to a scheme devised by Roseberry and his

---

[1]    The testimony regarding Roseberry's initial drug deliveries for the Pembertons is unclear and conflicting. We present the facts in the light most favorable to sustaining the jury's verdict. *State v. Hall*, 204 Ariz. 442, 445 n.1, 65 P.3d 90, 93 n.1 (2003).

friend, Charles Dvoracek, Dvoracek traveled to Wickenberg, Arizona, where he was supposed to intercept and steal the motorhome and marijuana while Roseberry and Fottler ate at a Denny's restaurant. So in the early morning hours of October 21, 2000, Dvoracek parked his truck on the side of the road and waited for the motorhome to stop at Denny's. But the motorhome did not stay at the restaurant; instead, after pulling off the road, Roseberry drove the motorhome back onto the highway and continued north toward his home in Nevada.

¶6 Dvoracek followed the motorhome, which Roseberry soon pulled over onto the shoulder of the road. As Dvoracek pulled in behind it, he heard two pops. Roseberry stepped out of the motorhome and told Dvoracek that he had "shot the guy" the Pembertons had sent to accompany him on the drug run. Roseberry explained that he pulled the motorhome over because Fottler had fallen asleep on the couch. He seized the opportunity to shoot Fottler in the back of the head.

¶7 Because Fottler was still making gurgling noises, Roseberry returned to the motorhome and shot him a third time. Roseberry and Dvoracek then wrapped Fottler's body in a blanket and dumped it into the gully on the side of the road.

¶8 As Roseberry drove north through Arizona, he threw his gun out the window of the motorhome. Roseberry and Dvoracek stopped in Kingman, Arizona, to remove other evidence of the

crime. They took a blood-stained sheet from the motorhome and threw it over a fence. They also buried Fottler's wallet and moved one of the duffle bags of marijuana from the motorhome to Dvoracek's truck so Dvoracek could sell the drugs to raise money in case it became necessary to bail Roseberry out of jail.

¶9 When the men arrived at Roseberry's home in Henderson, Nevada, on October 21, 2000, they put the motorhome and drugs into storage.

¶10 Later that day, Roseberry confided to his wife, Diane, that he killed Fottler so he could steal the marijuana and sell it himself. Roseberry told her that his story was going to be that "some Mexicans" with guns were on board the motorhome with him and the victim, and they had killed Fottler while Roseberry was out of the vehicle.

¶11 Diane called her brother, Otis Sonny Bowman, and asked him to fly in from Indiana, which he did in the early morning hours of October 22, 2000. Two drug dealers flew in with Bowman. The drug dealers agreed to purchase about 300 pounds of marijuana, which Bowman later transported to Ohio in Roseberry's motorhome. Roseberry and Dvoracek split the money from the sale.

¶12 Dvoracek's neighbor, Steven Berkowitz, also transported three loads of marijuana to Ohio for Roseberry and Dvoracek. On his third trip, however, Berkowitz was stopped by the local highway patrol and arrested for drug possession.

**B.    The Arrest, Investigation, and Trial**

¶13     Fottler's body was soon discovered in Arizona. Investigative leads from United States Customs agents quickly led Yavapai County Deputy Sheriffs to Roseberry, whose motorhome customs agents had observed while surveilling a Tucson stash house.

¶14     An arrest warrant and indictment were issued for Roseberry. The State timely notified him that it would seek the death penalty, but the notice did not specify the aggravating factors on which the State would rely.

¶15     The jury found Roseberry guilty of the first-degree murder of Fottler, transportation of more than two pounds of marijuana for sale, and conspiracy to transport more than two pounds of marijuana for sale. The court held the aggravation phase of the trial the next day. The jury found beyond a reasonable doubt that Roseberry committed the murder for pecuniary gain. After a six-month delay and the dismissal of two jurors, the court held the penalty phase of the trial.

¶16     On June 6, 2003, the jury returned a verdict of death, finding that any mitigating factors were not sufficiently substantial to call for leniency. On July 14th, the judge sentenced Roseberry to death for Fottler's murder, to an aggravated term of ten years' imprisonment for conspiracy to transport two pounds or more of marijuana for sale, and to a

consecutive aggravated term of ten years' imprisonment for transportation of marijuana for sale. An automatic notice of appeal was immediately filed, challenging all of Roseberry's convictions and sentences.

## II. DISCUSSION

¶17    Roseberry raises thirteen issues on appeal and lists fourteen others to prevent preclusion. We address only those issues argued to this court and attach a list of preserved claims as an appendix to this opinion.

### A.    Ex Post Facto Violation

¶18    Roseberry argues that the new death penalty sentencing statute, A.R.S. § 13-703.01 (Supp. 2004), violates the ex post facto provisions of the state and federal constitutions, and A.R.S. § 1-244 (2002).[2]  In *State v. Ring*, 204 Ariz. 534, 547, ¶ 24, 65 P.3d 915, 928 (2003) ("*Ring III*"), this court held that A.R.S. § 13-703.01 does not violate either the state or federal constitutional prohibitions against ex post facto laws because jury sentencing is not a substantive change from prior Arizona law, but rather is merely a procedural change. *See also Schriro*

---

[2]    Roseberry challenges application of the new statute on the basis of A.R.S. § 1-244, which provides that "[n]o statute is retroactive unless expressly declared therein." This argument fails because the legislature expressly provided that the new sentencing procedures in A.R.S. § 13-703.01 would apply to any sentencing proceeding on any first degree murder case held after the effective date of the amending act. 2002 Ariz. Sess. Laws, ch. 1, § 7.

*v. Summerlin*, 124 S. Ct. 2519, 2524 (2004); *State v. Towery*, 204 Ariz. 386, 391, ¶ 12, 64 P.3d 828, 833 (2003). Because this procedural change does not retroactively alter the definition of the crime of murder or increase the penalty, Roseberry's ex post facto claim fails. *See Ring III*, 204 Ariz. at 545-46, ¶ 16, 65 P.3d at 926-27.

**B.   Notice of Aggravating Factor and Presentation to Grand Jury**

¶19      Roseberry argues that his state and federal jury trial rights were violated because the State did not present the aggravating factor to the grand jury for a probable cause determination. He also claims that the State's failure to provide formal notice of the aggravating circumstance on which it would rely in seeking the death penalty violates his state and federal due process rights, as well as his right to notice under Rule 15.1(g) of the Arizona Rules of Criminal Procedure.

¶20      We recently ruled that neither the state constitution nor the United States Supreme Court opinions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*), require that aggravating factors be presented to the grand jury. *McKaney v. Foreman (State)*, 209 Ariz. 268, 269, ¶ 1, 100 P.3d 18, 19 (2004). The question resolved in *McKaney* is the same one Roseberry raises. We therefore conclude

that the trial court did not err in refusing to submit the pecuniary gain aggravating circumstance to the grand jury.[3]

**¶21**     Roseberry next argues that his due process rights were violated because he did not receive formal notice of the aggravating factor.  The State admits that it did not provide notice pursuant to Arizona Rule of Criminal Procedure 15.1(i)(2).  However, Roseberry did not object to the lack of notice before trial, during trial, or before the aggravation phase, and he does not claim surprise or prejudice.  Because there was no objection, we review this claim only for fundamental error.  *See State v. Moody*, 208 Ariz. 424, 449-50, ¶ 85, 94 P.3d 1119, 1144-45 (2004).  "Fundamental error is 'error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial.'"  *Id*. at 450, ¶ 86, 94 P.3d at 1145 (quoting *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977)).

**¶22**     Roseberry's trial fell into a procedural gap caused by a change in notice requirements under the rules of criminal procedure.  The previous rule allowed the State to disclose its list of aggravating circumstances within ten days after a jury returned a verdict of guilt on a first-degree murder charge.

---

[3]     Moreover, claims relating to problems in the grand jury process must be raised before trial. *State v. Moody*, 208 Ariz. 424, 439-40, ¶ 31, 94 P.3d 1119, 1134-35 (2004).  Roseberry failed to raise this claim before trial and thus waived his claim.

Ariz. R. Crim. P. 15.1(g)(2)(a) (2001). After the United States Supreme Court released its *Ring II* decision in June of 2002, however, Arizona amended its death penalty statute and corresponding rules of criminal procedure. Roseberry's trial was postponed six months to allow the legislature to change its laws to conform to the *Ring II* requirements.

¶23 The rule now in effect requires the State to provide notice of the aggravating factors on which it will rely in seeking the death penalty within sixty days of arraignment. Ariz. R. Crim. P. 15.1(i)(2) (2005). That requirement was not in place when Roseberry was charged; under the old rule, the State could provide notice ten days after the murder conviction. *See* Ariz. R. Crim. P. 15.1(g)(2)(a) (2001). In Roseberry's case, however, the aggravation phase of the trial began the day after the guilt phase verdict was returned, nine days before notice of the aggravating factors was due.

¶24 Roseberry conceded at oral argument that he received actual notice of the aggravating circumstance on or before October 30, 2002, when the State filed its requested jury instructions for the aggravation phase of the trial. Among other requested instructions, the State requested an instruction on the aggravating factor of pecuniary gain. Roseberry therefore had actual notice within the time prescribed by the rule then in effect and more than a month before trial.

¶25     Because Roseberry had actual notice of the aggravating circumstance before trial and conceded at oral argument that he suffered no prejudice from the lack of formal notice, he was not denied due process.  *See State v. Lee*, 185 Ariz. 549, 556, 917 P.2d 692, 699 (1996).  We do not find fundamental error on this point.

### C.  Potential Jurors' General Objections to the Death Penalty

¶26     Roseberry contends that the trial court abused its discretion by excusing eleven potential jurors for cause based on their personal objections to the death penalty.  We review a trial judge's decision to strike potential jurors for cause for abuse of discretion.  *State v. Jones*, 197 Ariz. 290, 302, ¶¶ 24, 26, 4 P.3d 345, 357 (2000).  Because defense counsel did not object to the dismissal of individual jurors, however, we review only for fundamental error.  *Moody*, 208 Ariz. at 449-50, ¶ 85, 94 P.3d at 1144-45.

¶27     The Sixth Amendment prohibits the exclusion for cause of venire persons solely because they "have general objections to the death penalty."  *State v. Anderson*, 197 Ariz. 314, 318, ¶ 6, 4 P.3d 369, 373 (2000) (citing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)).  In *Anderson*, we held that "[a] general objection to the death penalty is not sufficient to create a presumption that a prospective juror is unfit because of bias to

- 10 -

sit on the panel." *Id.* This rule, however, has an exception: "prospective jurors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case" may be excused for cause without violating the constitution. *Id.* ¶ 7 (citing *Witherspoon*, 391 U.S. at 514). Prospective jurors should be excused for cause if either their objection to, or support of, the death penalty prevents them from properly judging the facts of a particular case. *Id.* (citing *Morgan v. Illinois*, 504 U.S. 719, 734 n.7 (1992)).

¶28    Roseberry requested that the trial judge privately voir dire each potential juror who indicated a strong feeling regarding the death penalty. The judge agreed to do so. After explaining to the potential jurors that the penalty phase of the trial might require them to impose a sentence of death, the judge asked those assembled in the courtroom if any of them believed "that their ability to perform their duty [as jurors] would be substantially impaired or simply would be prevented" by their beliefs regarding the death penalty. Eight people responded affirmatively, and all eight of them were brought into chambers individually for further questioning.[4]

        1.    Prospective Juror I.J.

¶29    The judge asked I.J. pointed questions about his

---

[4]    Roseberry does not object to the dismissal of Juror L.J. and thus her dismissal will not be addressed. Initials are used to protect the privacy of these individuals.

opposition to the death penalty, and I.J. responded that he "would not be able to . . . effectively come to a right decision." The prosecutor followed up with questions to which I.J. ultimately responded that he would follow the law set forth in the judge's instructions. Based on that response, the judge did not strike I.J. at that time.

### 2. Prospective Juror J.S.

¶30 When asked in chambers about her objection to the death penalty, J.S. responded that she could not impose the death penalty on anyone and could not consider the State's evidence in the aggravation phase of the trial. Defense counsel tried to rehabilitate J.S., but she maintained her position that she could never vote to impose the death penalty. The judge excused her for cause, without objection by either counsel.

### 3. Prospective Juror B.H.

¶31 After explaining to B.H. the procedure and issues in Roseberry's case, the judge asked if she had any questions about them. B.H. stated that she could not "come to grips with being a part of something that sends somebody to death." After further questioning, she explained that even if all the facts pointed toward a conviction, she was not sure she could convict because she could be sending somebody to death. The prosecutor asked B.H. if she could set aside her feelings and follow the law, to which she responded, "No, I wouldn't, I wouldn't be able

to." Defense counsel tried to rehabilitate her, but B.H. stated that, for her, imposing death was not an option. She further stated that "if it came right down to it, I could not apply the death penalty." At that point, the judge excused B.H. for cause, without objection by either counsel.

### 4. Prospective Juror F.F.

¶32 Asked whether she could serve as a trial juror, F.F. responded, "I couldn't do the death penalty for anybody. I'd feel really, really, really — I couldn't do it." She stated that she couldn't "even hit a fly." Defense counsel tried to rehabilitate F.F., but she remained adamant that she could not sentence anyone to death. When the judge again questioned F.F., she reaffirmed, "I can't do the death penalty for anybody." At that point, the judge dismissed F.F. for cause, without objection by either counsel.

### 5. Prospective Juror M.M.

¶33 After explaining the legal proceedings to M.M., the judge asked him if he would be able to serve as a trial juror. M.M. stated that he is "very much against and [his] religion is against the death penalty." He expressed no problem with determining guilt or innocence, but maintained that he could not say that someone deserves the death penalty. The judge then asked him, "No matter what the State would prove, you would not vote or make your verdict be death?" The prospective juror

- 13 -

responded, "That's right." Defense counsel tried to rehabilitate M.M., but he continued to assert that he could not sentence anyone to death. Based on M.M.'s answers, the trial judge dismissed him, without objection by either counsel.

### 6. Prospective Juror E.Y.

¶34 After explaining the trial process to prospective juror E.Y., the judge asked him if it would be impossible for him to follow the law, to which E.Y. responded "yes." He stated that he was "strongly opposed to the death penalty. I would rather find a man innocent and put him out on the streets than send him to his death." Defense counsel tried to rehabilitate the juror, but E.Y. insisted that he "could not send a man to his death." Based on his answers, the trial judge excused E.Y. for cause, without objection by either counsel.

### 7. Prospective Juror S.S.

¶35 After explaining the trial process to S.S., the judge asked her if it would be possible for her to be a trial juror. She responded that she "could never, never, never, never go along with" the death penalty. She went on to say that "God takes life, not people." Defense counsel tried to rehabilitate S.S., and she did indicate that she could determine innocence or guilt, but she maintained that she could not follow the judge's instructions if it "involved death." At that point, the judge dismissed S.S. for cause, without objection by either counsel.

¶36    She was the last juror individually questioned on the first day of jury selection; but the following day, after the court reassembled the prospective jurors and asked if any might have a problem being a juror in this case, ten people raised their hands.  In response, the court individually questioned an additional nine jurors and met with Juror I.J. again.[5]

### 8.   Prospective Juror S.A.

¶37    When asked by the judge about her concerns about being a trial juror, S.A. said, "I just feel like from a moral standpoint I could not go along with the death penalty." Defense counsel tried to rehabilitate the potential juror, but S.A. insisted that she could not vote to impose death.  With that, the judge excused S.A. for cause, without objection by either counsel.

### 9.   Prospective Juror R.J.

¶38    When questioned by the judge, R.J. stated, "I just don't believe in the death penalty."  The judge explained the trial process to him and asked if he would be able to apply the law, and R.J. replied that he would not.  Defense counsel tried to rehabilitate R.J., but when asked if he would follow the judge's instruction, he said he would not be able to vote for death even if the defense did not establish mitigation

---

[5]    From the second day's proceedings, we describe only the questioning of the five potential jurors whose dismissals Roseberry challenges as error on appeal.

sufficient to call for leniency. At that point, the judge excused R.J., without objection by either counsel.

### 10. Prospective Juror I.J.

¶39 Juror I.J. had been questioned in chambers the previous day, but indicated on the second day that it would be impossible for him to be a trial juror, and so he was individually questioned again. I.J. stated that he had spent a "very sleepless night" since his questioning in chambers the day before, and he had concluded that "no amount of evidence . . . could ever convince [him] to put any individual to death." Defense counsel questioned I.J. further about his beliefs, to which I.J. responded "there is no amount of evidence that would ever convince me to put anybody to death." The judge then dismissed I.J. for cause, without objection by either counsel.

### 11. Prospective Juror K.G.

¶40 Juror K.G. stated that he could never "convict someone if it required the death penalty." He said that regardless of the evidence, he would be unable to vote for death and unable to follow the law. Both counsel questioned K.G., but he held fast to his position. At that point, the judge dismissed K.G. for cause, without objection by either counsel.

### 12. Prospective Juror L.E.

¶41 Prospective juror L.E. stated that she did not believe she could vote for the death penalty under any circumstances.

The judge asked L.E. if she would be able to follow the law, and she said no; she did not feel that she had the "right to do that to somebody." Defense counsel explained the trial process to L.E., and she responded that she could not vote for death. She stated firmly that she would not follow the law because it was not up to her to decide if someone should die. The judge then dismissed L.E. for cause, without objection by either counsel.

¶42    All eleven of the dismissed prospective jurors were carefully questioned by the trial judge and defense counsel. Defense counsel did not object to any of the dismissals and thus this court reviews the dismissals only for fundamental error. *See Moody*, 208 Ariz. at 449-50, ¶ 85, 94 P.3d at 1144-45.

¶43    Roseberry claims that his death sentence cannot be upheld because the jury was chosen after excluding venire persons for cause solely because they voiced general objections to the death penalty. His premise is incorrect: Each dismissed juror expressed more than a general objection to the death penalty. As illustrated above, all admitted that they would not follow the judge's instruction on the law and thus it was appropriate for the judge to dismiss them.

¶44    The trial judge was exceptionally careful in questioning each juror who indicated disagreement with the death penalty, and defense counsel personally examined those jurors. Each dismissed juror clearly stated that he or she would not

follow the law, if following the law meant that the defendant would be sentenced to death. Such statements meet the standards for dismissal set forth in *Witherspoon*, 391 U.S. 514, and adopted by this court in *Anderson*, 197 Ariz. at 318, ¶¶ 6-7, 4 P.3d at 373, and thus there was no error, fundamental or otherwise.

### D. Insufficient Evidence of Pecuniary Gain

**¶45** Roseberry claims that the evidence that he committed the murder for pecuniary gain was insufficient to support the verdict. *See* A.R.S. § 13-703(F)(5) (Supp. 2004).[6] This court reviews a jury's finding for substantial evidence, viewing the facts in the light most favorable to sustaining the jury verdict.[7] *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990).

**¶46** To prove that a defendant was motivated by a desire for pecuniary gain, "the state must prove that pecuniary gain was a 'motive, cause, or impetus for the murder and not merely the

---

[6] Roseberry did not raise this issue at trial by way of a Rule 20 motion or objection.

[7] In addition, this court conducts an independent review. *See infra* § J, ¶¶ 77-79.

result.'" *State v. Cañez*, 202 Ariz. 133, 159, ¶ 91, 42 P.3d 564, 590 (2002) (quoting *State v. Kayer*, 194 Ariz. 423, 433, ¶ 32, 984 P.2d 31, 41 (1999)). "[P]ecuniary gain aggravation does not require a motive to kill [but may] be based upon a causal connection between the pecuniary gain objective and the killing." *Id.* ¶ 93.

¶47    At the aggravation phase of Roseberry's trial, neither the State nor the defense presented any new evidence because the aggravation jury was the same jury that heard the guilt-phase evidence. Instead, both counsel made closing arguments.

¶48    During his argument, the prosecutor reminded the jury that the evidence showed that Fottler was killed so that Roseberry could steal and sell the marijuana. He further reminded the jury that Roseberry had admitted during the trial that he started transporting marijuana for the Pembertons because he needed the money. Roseberry also told his wife and Dvoracek that he was going to make a lot of money by selling the marijuana himself after getting rid of Fottler.

¶49    The pecuniary gain motive is further illustrated by the evidence that Roseberry and his co-conspirators wasted no time in setting up a deal to sell some of the marijuana. Indeed, they called Bowman the very day Fottler was killed. Later, Roseberry and Dvoracek arranged to have Berkowitz transport marijuana to Ohio, and they split the proceeds of those sales.

¶50    The jury found beyond a reasonable doubt that Roseberry was motivated to kill Fottler by the desire for pecuniary gain, and that finding is well supported.  Indeed, it is difficult to imagine any other reason for Roseberry to kill Fottler. Roseberry admitted that he had met Fottler only once before the ill-fated drug run, and that meeting lasted just a few minutes. There was no evidence of animus toward Fottler and no evidence that hostility erupted between the two men during their motorhome trip.

¶51    Reasonable evidence clearly supports the jury's finding that the receipt of pecuniary gain served as a motive, cause, or impetus for the murder of Fottler, and thus we affirm the jury's finding of the (F)(5) aggravating factor.

### E.    Error in Jury Instructions

¶52    Roseberry makes three claims of error regarding the jury instructions.

¶53    First, he argues that the trial court improperly instructed the jurors to consider mitigation evidence using a "significant impairment" standard.  He did not, however, object to the instructions during the trial and actually included the same "significant impairment" language in the jury instructions he requested for the penalty phase.  Roseberry therefore invited any error and waived his right to challenge the instruction on appeal.  *See State v. Logan*, 200 Ariz. 564, 565-66, ¶ 9, 30 P.3d

631, 632-33 (2001) (stating that we "will not find reversible error when the party complaining of it invited the error").

¶**54**     Second, Roseberry claims that the trial court gave the following instruction to the jury:  "Aggravating circumstances are those which *increase the guilt* or the enormity of the offense."  That language, however, was not part of the court's instructions to the jury.  Although the State included the instruction in its proposed jury instructions for the aggravation phase, the trial court declined to give the requested instruction.  We therefore will not address the issue.

¶**55**     Third, Roseberry asserts that the trial court's reasonable doubt instruction violated his right to a fair trial and denied him due process.  The instruction at issue is identical to the one set forth in *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), which we have upheld as constitutional several times.  *See State v. Lamar*, 205 Ariz. 431, 441, ¶ 49, 72 P.3d 831, 841 (2003); *State v. Prince*, 204 Ariz. 156, 161, ¶ 25, 61 P.3d 450, 455 (2003); *Cañez*, 202 Ariz. at 156, ¶¶ 75-76, 42 P.3d at 587.  Furthermore, Roseberry did not object to this instruction, and thus this court will only review for fundamental error.  *See State v. Gallegos*, 178 Ariz. 1, 11, 870 P.2d 1097, 1107 (1994).  Because the language of the instruction is required by our holding in *Portillo*, the trial

court did not commit any error, much less fundamental error, in giving that instruction.

### F.    Separation of Powers

¶56    Roseberry claims that A.R.S. § 13-703.05 (Supp. 2004), which requires review of death sentences for abuse of discretion, violates the separation of powers doctrine, as well as the Eighth and Fourteenth Amendments to the United States Constitution.   However, by its own terms, the statute does not apply in Roseberry's case.    Although the legislature stated clearly that A.R.S. § 13-703.05 applies "to any sentencing or resentencing proceeding on any first degree murder case that is held after the effective date of this act," it applies to a capital case only if "the offense was committed on or after the effective date of this act."   2002 Ariz. Sess. Laws, ch. 1, § 7(C).   The statute became effective August 1, 2002.   *Id.* § 5. The murder in this case occurred in October, 2000.   Section 13-703.05, A.R.S., is therefore inapplicable to this case.

### G.    Double Punishment, A.R.S. § 13-116

¶57    Roseberry argues that the trial judge violated the double punishment prohibition in A.R.S. § 13-116 by imposing consecutive sentences for conspiracy to transport and actual transportation of marijuana.[8]   The statute provides, in relevant

---

[8]    In his analysis of this issue, appellate counsel appears to confuse this case with another, as he refers to four victims and

part, that "[*a*]*n act* or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." A.R.S. § 13-116 (2001) (emphasis added).

¶58 To determine whether conspiracy and transportation constitute separate acts, for which consecutive sentences are permissible, or only one act, for which sentences must be concurrent, we first apply the "identical elements test." *See State v. Gordon*, 161 Ariz. 308, 312, 778 P.2d 1204, 1208 (1989) (citing *State v. Tinghitella*, 108 Ariz. 1, 3, 491 P.2d 834, 836 (1971)). The test requires that we identify the ultimate crime, discard the evidence that fulfills the elements of that crime, and then determine whether the remaining facts satisfy the elements of the other crimes. *Id.* (citing *State v. Vaughn*, 147 Ariz. 28, 30, 708 P.2d 453, 455 (1985)). If they do, then consecutive sentences are permissible unless, given the entire transaction, it was not possible to commit the ultimate crime without also committing the other offense. *Id.* at 315, 778 P.2d at 1211. Finally, if such a factual impossibility exists, we

---

argues that Roseberry cannot serve consecutive sentences for first-degree burglary and being a prohibited possessor. Roseberry, however, was not charged with or convicted of either of those crimes, and his case involves only one victim. The issue in this case relates to the marijuana charges and thus we will apply the arguments made in Roseberry's brief to the actual facts of his case. Review of this legal issue is de novo. *See Galaz v. Stewart*, 207 Ariz. 452, 454, ¶ 7, 88 P.3d 166, 168 (2004).

must ascertain whether Roseberry's conduct in committing the secondary crime subjected the victim "to a different or additional risk of harm than that inherent in the ultimate offense." *Id.* at 314, 778 P.2d at 1210.

¶59 In this case, although Roseberry identifies the murder as the ultimate crime, he has not challenged the imposition of the sentences for the drug charges as consecutive to the sentence on the murder charge, but rather contests the order making the sentences for the conspiracy and transportation charges consecutive to each other. Because both conspiracy to transport more than two pounds of marijuana and transportation are class two felonies, *see* A.R.S. § 13-1003(D) (2001) (conspiracy takes on the same class as the offense that is the object of the conspiracy); *id.* § 13-3405(B)(11) (2001) (designating transportation of two pounds or more of marijuana a class two felony), neither is readily identifiable as the ultimate offense. Because Roseberry has not argued otherwise, we designate the conspiracy the ultimate crime for purposes of this analysis.

¶60 The evidence that fulfills the conspiracy was that Roseberry plotted with the Pembertons to use his motorhome to transport more than a thousand pounds of marijuana and drove to Phoenix. Discarding the evidence that supports that crime, we find that independent evidence establishes the transportation

offense, which occurred when Roseberry had the drugs loaded into his motorhome in Phoenix and then drove the marijuana-filled vehicle to Nevada. Thus the evidence established two distinct crimes that were committed by two entirely different sets of acts. The facts do not show the commission of a single act that "is made punishable in different ways by different sections of the laws" so as to preclude the imposition of consecutive sentences. *See* A.R.S. § 13-116.

¶61 In satisfaction of *Gordon*'s second step, the acts comprising the conspiracy and the transportation were such that Roseberry could have conspired to transport the drugs without ever actually transporting them. *See Gordon*, 161 Ariz. at 315, 778 P.2d at 1211.

¶62 The third *Gordon* requirement, "whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime," also supports the imposition of consecutive sentences. *Id.* The transportation and conspiracy crimes subjected the victim — society — to different risks. Conspiracy adds an element of concerted criminal activity that endangers society differently than individual acts do. *Cf. United States v. Feola*, 420 U.S. 671, 693 (1975) (noting that "the law of conspiracy serves ends different from, and complementary to, those served by criminal prohibitions of the substantive

offense"; conspiracy laws protect "society from the dangers of concerted criminal activity"); *see also Callanan v. United States*, 364 U.S. 587, 593 (1961) (observing that "collective criminal agreement — partnership in crime — presents a greater potential threat to the public than individual delicts"). Conspiracy to transport marijuana and the actual transportation of marijuana may thus be punished separately by our criminal laws. We therefore uphold the imposition of consecutive sentences for the drug-related convictions.

## H.    Dismissal of Juror Eight[9]

¶63    Roseberry argues that the dismissal of Juror Eight a week before the beginning of the penalty phase of the trial was an abuse of discretion and that the trial court erred by failing to instruct the reconstituted jury to begin sentencing deliberations anew, as is required by Arizona Rule of Criminal Procedure 18.5(h). We review a trial judge's decision to dismiss a juror for abuse of discretion. *State v. Milke*, 177 Ariz. 118, 122, 865 P.2d 779, 783 (1993). Because Roseberry did not object to the dismissal of the juror or the trial judge's failure to instruct the reconstituted jury to "begin deliberations anew," we will review only for fundamental error.

---

[9]    Roseberry does not contest the dismissal of Juror Ten, who was dismissed for having read newspaper accounts of the trial after serving on the jury for the guilt and aggravation phases, but before the penalty phase.

*Moody*, 208 Ariz. at 449-50, ¶ 85, 94 P.3d at 1144-45.

**¶64** A jury convicted Roseberry on December 19, 2002; that same jury found the pecuniary gain aggravating factor the next day. After a stay to allow the defense to take a special action to the court of appeals, the trial court set the mitigation hearing for June 4, 2003. On May 27, 2003, however, Juror Eight handed the bailiff a letter from a doctor. The letter stated that the juror's wife was scheduled to undergo open-heart surgery on June 4th, the day the jury was supposed to reconvene for the mitigation or penalty phase of the trial. The judge held an impromptu hearing with counsel on May 28th to address the issue.

**¶65** The prosecutor asked the judge to dismiss Juror Eight, and although both defense lawyers addressed Roseberry's absence from the hearing,[10] they did not clearly object to the dismissal of Juror Eight, nor did they raise any concerns about potential procedural problems based on Rule 18.5(h). The judge decided to dismiss Juror Eight and replace him with an alternate.

**¶66** In addressing the reconstituted jury before the mitigation hearing began, the trial judge carefully questioned each juror to make sure each had followed the admonition not to

---

[10] Roseberry did not attend the hearing and his counsel refused to waive his presence. Roseberry does not raise the lack of waiver as an issue on appeal and therefore we do not address it.

discuss the case or read about it during the six-month break. He then gave explicit instructions that the jurors must consider all of the evidence from the trial, including the guilt, aggravation, and penalty phases. For example, he instructed the jury: "The evidence you consider at the penalty phase is the evidence presented at the guilty-not guilty phase and the aggravation phase as well as any evidence presented at the penalty phase." He cautioned that the jurors "must consider any evidence presented in the penalty phase, as well as any evidence [they] heard at the previous two phases that related to any mitigating circumstance to decide whether there are any mitigating circumstances and to assess what weight to – to give to any mitigating circumstance." The judge also instructed the jurors to evaluate the weight to be given the pecuniary gain factor.

¶67    Furthermore, the trial judge took precautions to ensure that Juror Twelve, the alternate who replaced Juror Eight, was able to deliberate for the penalty phase. Juror Twelve affirmed that he had no problem serving as a juror and deliberating in the penalty phase. The prosecutor asked the juror about his comfort with the prior proceedings and the jury findings:

     Prosecutor:    You understand that the jury has
                    deliberated without you and now you're
                    going to step in to deliberate?
     Juror:         Yes, I do.
     Prosecutor:    You understand that that jury has found

<pre>
                         Mr.  Roseberry  guilty  of  first-degree
                         murder?
          Juror:         Yes.
          Prosecutor:    Do  you  understand  that  the  jury  has
                         also  found  that  the  State  has  proven  an
                         aggravating  circumstance?
          Juror:         Yes.
          Prosecutor:    Those  have  to  be  your  verdicts  as  well.
                         Do  you  have  any  difficulty  with  that
                         concept?
          Juror:         No,  I  don't.
</pre>

¶68     Defense counsel asked the juror if he had any problems sitting as a juror only for the mitigation portion of the trial, to which Juror Twelve responded that he did not.  At that point, the judge allowed the juror to return to the waiting room while the judge and counsel continued to voir dire the remaining jurors.

¶69     Although we recognize that it is preferable to complete a defendant's trial with the same jury that began it, our Rules of Criminal Procedure allow an alternate to be seated for the penalty phase of the criminal trial.  *See* Ariz. R. Crim. P. 18.5(i) ("In the event a deliberating juror is excused during either the aggravation or penalty phases due to inability or disqualification to perform required duties, the court may substitute an alternate juror . . . to join in the deliberations.").  We have held that a defendant is not constitutionally entitled to have the same jury that rendered a guilty verdict decide resentencing.  *Ring III*, 204 Ariz. at 551, ¶ 39, 65 P.3d at 932.

¶70     The alternate juror was questioned extensively by the court and both counsel about his role as a replacement juror, and no one objected to his placement on the jury.  Moreover, Roseberry makes no effective argument showing why the replacement juror should not have been seated.  We find, therefore, that there was no fundamental error in the replacement of Juror Eight for the mitigation phase of Roseberry's trial.

¶71     Roseberry next complains of the trial judge's failure to instruct the jury, as Rule 18.5(h) requires, to "begin deliberations anew."  The failure was logical, however, because no penalty phase deliberations had begun before Juror Twelve was seated.  Indeed, the newly constituted jury had not yet heard any evidence or argument on mitigation.

¶72     Roseberry does not address Rule 18.5(i), which instructs that a jury reconstituted to hear penalty deliberations "shall not deliberate anew about a verdict already reached and entered," but "shall only begin anew for the phase of the sentencing that [the juror is] currently deliberating."  The trial judge carefully followed these rules:  He instructed the jury that it was to consider all of the evidence presented in the case when it made its mitigation finding.  He specifically instructed the jurors to consider the evidence presented at the guilt phase, as well as at the aggravation and

penalty phases. The judge's instructions were sufficient to protect Roseberry's due process rights. We find no error.

### I. Failure to Consider Mitigation Evidence

¶73 Roseberry claims that his constitutional rights were violated because, although the jurors heard the mitigation evidence on five statutory and five non-statutory mitigating factors, they failed to find that mitigating factors existed, or if they did find the factors to exist, they failed to give them sufficient weight.[11] He contends that because the trial judge found the three mitigating factors — lack of prior convictions, medical problems, and childhood difficulties — when sentencing Roseberry for the drug offenses, the jury must have failed to consider these factors for the murder offense.

¶74 But other than noting that the trial judge found the mitigating factors in connection with the sentencing on the drug convictions, Roseberry does not say why he believes the jury did not consider any mitigating evidence. Because there is no special verdict on mitigation,[12] we cannot tell whether the jury failed to find the mitigating factors, or whether it did find

---

[11] This court's independent review of these factors is set forth in § J, ¶¶ 77-79, *infra*.

[12] There cannot be a special verdict on mitigation because the jurors need not agree that a mitigating factor has been proven to exist. A.R.S. § 13-703(C) (2004). "Each juror may consider any mitigating circumstances found by that juror in determining the appropriate penalty." *Id.*

some or all of them to exist, but concluded that they did not outweigh the aggravating factor of pecuniary gain. The finding and weighing of mitigating factors is for the jury. A.R.S. § 13-703.01(H). That the judge may have found certain mitigating factors does not mean that the jury had to find the same factors, as long as the jury's findings were supported by reasonable evidence. Roseberry has not shown that any jury finding was unsupported, nor has he shown any failure by the jury to perform its duty. Indeed, he has not shown that the jury did not find the same factors the trial judge found.

¶75 Nor does Roseberry argue that the jurors were improperly instructed. To the contrary, the record shows that they were comprehensively instructed to consider all of the evidence presented at the trial, including "factors in fairness and mercy [that] may support a sentence other than death." We presume that the jury followed those instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also State v. LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996).

¶76 Finally, the penalty verdict form, signed by the jury foreman and read in open court, states that the jury "considered all the facts and circumstances of this case." Absent contrary evidence or effective argument, we must presume that this is true. *See LeBlanc*, 186 Ariz. at 439, 924 P.2d at 443. We find no merit in Roseberry's claim that the jury improperly weighed

- 32 -

or failed to find mitigation evidence.

## J.    Independent Weighing

**¶77**        This court independently reviews the jury's findings of aggravation and independently determines "if the mitigation is sufficiently substantial to warrant leniency in light of existing aggravation."  *State v. Greene*, 192 Ariz. 431, 443-44, ¶ 60, 967 P.2d 106, 118-19 (1998); *see also* A.R.S. § 13-703.04. The recent revisions to Arizona's criminal code have not changed our review of the death sentence in this case because the crime occurred before 2002.  We do not defer to the findings or decision of the jury, but must review the record de novo to determine the propriety of the death sentence.  We consider "the quality and the strength, not simply the number, of aggravating and mitigating factors."  *Greene*, 192 Ariz. at 443, ¶ 60, 967 P.2d at 118.

**¶78**        In this case, the State proved beyond a reasonable doubt that Roseberry committed Fottler's murder for pecuniary gain.  *See State v. Phillips*, 205 Ariz. 145, 147, ¶ 7, 67 P.3d 1228, 1230 (2003) (reasonable doubt standard).  He told his wife and Dvoracek that he was going to make a lot of money selling the marijuana and he could only do so by getting rid of Fottler. Thus, the expectation of pecuniary gain clearly motivated or served as the impetus for Roseberry's actions.  *See* A.R.S. § 13-703(F)(5).

¶79     Our independent review further shows that the evidence of mitigation is not sufficiently substantial to call for leniency.  As noted in ¶¶ 73-76, Roseberry presented evidence on five statutory and five non-statutory mitigating circumstances, all of which were either weak or non-existent.  In reviewing the entire record, we do not find mitigating evidence sufficiently substantial to call for leniency and thus we affirm Roseberry's sentence of death.

### III.   CONCLUSION

¶80     For the foregoing reasons, Roseberry's convictions and sentences are affirmed.


_____
Rebecca White Berch, Justice


CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

Roseberry raises the following issues in order to prevent federal preclusion. He acknowledges that this court has decided all issues adversely to the positions he asserts. Each proposition is followed by a citation to case law rejecting the position he asserts.

A.    The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *State v. Smith*, 203 Ariz. 75, 81, ¶ 30, 50 P.3d 825, 831 (2002).

B.    The death penalty is imposed arbitrarily and irrationally in Arizona and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 4 and 15 of the Arizona Constitution. *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

C.    Application of the death penalty on the facts of this case would constitute cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. *Smith*, 203 Ariz. at 81, ¶ 30, 50 P.3d at 831 (rejecting the argument that the death penalty is cruel and unusual punishment under any circumstances).

D.    The State's discretion to seek the death penalty has

no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. *State v. Spears*, 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996).

E. Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

F. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *Smith*, 203 Ariz. at 82, ¶ 32, 50 P.3d at 832.

G. Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *State v. Ring*, 200 Ariz. 267, 284, ¶ 64, 25 P.3d 1139, 1156 (2001), *rev'd on other grounds*, *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

H.    Section 13-703.01, A.R.S., provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *See State v. White*, 194 Ariz. 344, 355, ¶ 49, 982 P.2d 819, 830 (1999) (discussing standards for court's weighing of factors).

I.    Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *State v. Poyson*, 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

J.    Section 13-703.01, A.R.S., does not sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify its imposition. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution. *Smith*, 203 Ariz. at 82, ¶ 40, 50 P.3d at 832.

K.     Execution by lethal injection is cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

L.     Arizona unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

M.     Arizona's death penalty statute is unconstitutional in that it requires defendants to prove that their lives should be spared, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15 of the Arizona Constitution.  *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).