SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-07-0438-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2002-016160A |
| ALFREDO LUCERO GARCIA, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable John R. Ditsworth, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          Amy Pignatella Cain, Assistant Attorney General
          Jeffrey A. Zick, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG, ATTORNEY AT LAW                    Fort Collins, CO
     By   David Goldberg
Attorney for Alfredo Lucero Garcia
_____

**B A L E S**, Justice

¶1      Alfredo Lucero Garcia was convicted of armed robbery and first degree murder and sentenced to death for the murder. We have jurisdiction over this mandatory appeal under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

1

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

¶2        On the afternoon of May 21, 2002, Daniel Anderson was tending bar at Harley's Club 155.  Steven Johnson, the bar's owner, was talking with Anderson.  Garcia entered and asked to use the restroom; they directed him toward the rear of the bar, where there was also a back door.  Shortly thereafter, Johnson went to the rear of the bar and began fixing a broken ATM.  Anderson followed and they continued talking.  Johnson kneeled beside the ATM with a stack of $20 bills.

¶3        Garcia suddenly burst through the back door and shouted "drop the money."  Directly behind Garcia was James Taylor Sheffield, who was crouching and carrying a gun.  Johnson stood, threw the $20 bills on the ground, and said "just get out, get out of here."  Garcia pushed Johnson against the wall.  Anderson stood "frozen" until Johnson looked at him and said "get out of here."  Anderson ran into the bar's office, pushed an alarm button, and then escaped.  He heard a gunshot before entering the office and heard a scuffling sound followed by a second gunshot as he fled.

¶4        Anderson went to another bar and called the police.

---

[1]    Except in our independent review of the death sentence, we view the facts in the light most favorable to sustaining the jury's verdict.  *See State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

Upon arriving at Harley's, police found Johnson's body outside the back door and $20 bills scattered nearby. Police also viewed video recordings from bus security cameras on the afternoon of Johnson's murder. The recordings showed Garcia and Sheffield boarding a bus near the crime scene and later getting off at the same stop. The investigation ultimately led police to arrest Garcia on June 1 and Sheffield on June 6, 2002.

¶5        Garcia and Sheffield were each indicted on one count of first degree murder and one count of armed robbery; their trials were later severed. On November 13, 2007, a jury found Garcia guilty on both counts. After learning of possible juror misconduct, the trial court empanelled a new jury for the aggravation and penalty phases. The second jury found that Garcia was a major participant in the felony and was recklessly indifferent to Johnson's life. This jury also found two aggravators: Garcia had been previously convicted of a serious offense, *see* A.R.S. § 13-751(F)(2) (Supp. 2009); and he had committed first degree murder for pecuniary gain, *see* A.R.S. § 13-751(F)(5).[2] Concluding there was no mitigation sufficiently substantial to call for leniency, the jury determined that

---

[2]    Arizona recently renumbered its capital sentencing statutes to A.R.S. §§ 13-751 to -759 (Supp. 2009). 2008 Ariz. Sess. Laws, ch. 301, §§ 26, 38-41 (2d Reg. Sess.). This opinion cites the current version of the statutes.

Garcia should be sentenced to death.

## DISCUSSION

### I.    Suggestive Identification

¶6     Garcia challenges the trial court's denial of his motion to suppress Anderson's pretrial and in-court identifications. *Cf. State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969) (outlining procedures for hearing). In our review, we consider only the evidence presented at the suppression hearing and defer to the trial court's factual findings unless clearly erroneous. *State v. Moore*, 222 Ariz. 1, 7 ¶ 17, 213 P.3d 150, 156 (2009). The "ultimate question of the constitutionality of a pretrial identification is, however, a mixed question of law and fact," which we review de novo. *Id.*

¶7     On the day of the shooting, Anderson gave Detective Sandra Rodriguez a detailed description of the first man to enter the bar. Three days later, however, Anderson did not identify Garcia when shown a photographic lineup. That evening, the police department gave local TV stations copies of pictures from the bus security camera showing Garcia and Sheffield. Neither had yet been apprehended. The police contacted Anderson and other witnesses and told them to avoid watching any television coverage of the crime. Anderson, however, later saw the bus photographs in a reward flier that was neither created nor distributed by the police.

4

**¶8** On August 31, 2007, the trial court held a *Dessureault* hearing at which Anderson identified Garcia as one of the men who had entered Harley's. In denying Garcia's motion to suppress this identification and any prospective in-court identification, the trial court concluded that the photographic lineup was not unduly suggestive and that the reward flier had not impermissibly tainted Anderson's identifications because the police were not responsible for the flier.

**¶9** The trial court did not err in denying Garcia's motion to suppress. Garcia does not challenge the trial court's determination that the photographic lineup was not unduly suggestive. With regard to the flier, the trial court properly first considered whether the State was sufficiently responsible for the reward flier to trigger due process protection. *State v. Williams*, 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987); *see also State v. Prion*, 203 Ariz. 157, 160 ¶ 14, 52 P.3d 189, 192 (2002). The "due process clause does not preclude every identification that is arguably unreliable; it precludes identification testimony procured *by the state* through unduly suggestive pretrial procedures." *Williams*, 166 Ariz. at 137, 800 P.2d at 1245.

**¶10** Detective Rodriguez unequivocally testified that the police were not responsible for the reward flier. The flier was not introduced at the hearing, nor did any testimony identify

5

who created the flier; however, Detective Rodriguez speculated that whoever created the flier may have obtained the bus photographs from newspapers or online sources after the police released them to local TV stations.

¶11    That some unidentified third party may have used police-released photographs to create and distribute the flier does not constitute state action. *See Prion*, 203 Ariz. at 160 ¶ 15, 52 P.3d at 192 (holding that photograph of defendant on cover of periodical did not trigger due process concerns because not the result of state action); *State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 24, 25 P.3d 717, 729 (2001) (holding that when "the media, rather than the State, allegedly tainted [the witness's] identification of the defendant," the "state action requirement of the Fourteenth Amendment [could not] be established," making "due process analysis . . . inapposite").

¶12    Garcia argues that even in the absence of state action, the trial court should have analyzed the reliability of Anderson's identification under *State v. Atwood*, 171 Ariz. 576, 603, 832 P.2d 593, 620 (1992) (stating that "unnecessarily suggestive government identification procedures are [not] the *sine qua non* of due process concerns"). We, however, explicitly rejected this argument in *Nordstrom*, 200 Ariz. at 241 ¶ 25, 25 P.3d at 729 (disapproving *Atwood* in this respect and reiterating that "[o]nly identification evidence allegedly tainted by state

6

action must meet . . . reliability standard[s]").

## II.   Jury Selection Issues

### A. Case-specific Questioning

¶13     Garcia argues that by allowing the State to ask prospective jurors questions that reflected case-specific facts, the trial court allowed the State to pack the jury with jurors who would impose the death penalty in his case. We "review a trial court's rulings on *voir dire* of prospective jurors for abuse of discretion." *State v. Glassel*, 211 Ariz. 33, 45 ¶ 36, 116 P.3d 1193, 1205 (2005).

¶14     During voir dire for the first jury, the State said that there would be a question whether Garcia was the actual shooter and asked some prospective jurors if they could consider imposing a death sentence on a non-shooter. After the trial court excluded two prospective jurors who indicated that they might not be able to consider a death sentence in these circumstances, Garcia moved to preclude the State from asking jurors if the specific facts of Garcia's case would prevent them from imposing death. Although the State said it would ask questions that did not directly involve the facts of the case, it subsequently presented prospective jurors with several hypothetical situations that closely mirrored the facts of Garcia's case.

¶15     In reviewing the qualification of jurors in capital

cases, we have rejected efforts by defense counsel to elicit how prospective jurors will vote based on specific facts. *See State v. Smith*, 215 Ariz. 221, 231 ¶ 42, 159 P.3d 531, 541 (2007) (concluding that trial court did not abuse its discretion by refusing defendant's request to ask jurors if they would automatically impose death upon finding specific aggravators); *State v. Johnson*, 212 Ariz. 425, 434-35 ¶¶ 29-35, 133 P.3d 735, 744-45 (2006) (concluding that trial court did not abuse its discretion by refusing defendant's request to ask jurors whether they regarded specific factors as mitigation). Garcia argues that the trial court here impermissibly allowed the State to question jurors in a manner contrary to *Smith* and *Johnson*.

¶16    The trial court did not abuse its discretion in allowing the State to ask prospective jurors if they could consider imposing a death sentence if a defendant had not actually shot the victim. Given the nature of this case, these questions properly probed beyond abstract juror views on capital punishment. *See United States v. Fell*, 372 F. Supp. 2d 766, 769 (D. Vt. 2005) (noting that in some cases, "highly general questions may not be adequate to detect specific forms of juror bias," therefore, "the parties should be allowed to ask more specific questions to investigate potential bias"). And, unlike the rejected questions in *Smith* and *Johnson*, the State never asked jurors to precommit to a specific position; rather, it

8

merely asked jurors if they could *consider* the death penalty in circumstances in which it is permitted under Arizona law. *Cf. United States v. Johnson*, 366 F. Supp. 2d 822, 845 (N.D. Iowa 2005) (stating that a juror's willingness to consider life or death "commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions").

B. Dismissal of Juror O.

¶17 Garcia also argues that the trial court, over his objection, erroneously struck a "life-scrupled" juror because of his views on the death penalty. "We review a trial court's decision . . . to strike jurors for cause for abuse of discretion." *Glassel*, 211 Ariz. at 47 ¶ 46, 116 P.3d at 1207.

¶18 During defense counsel's questions, Juror O. stated that "I don't know if I can make the decision to vote for the death penalty. I don't know if I can say yes to death. I can't — I don't know if I can do that. I am very conflicted about it." After further questioning, Juror O. said that he thought he could vote for death "if the State meets its burden beyond a reasonable doubt regarding the law and the facts." However, when questioned by the State, Juror O. later stated that he was not sure he could vote for death.

¶19 The trial court did not abuse its discretion in striking Juror O. Although Juror O. said at one point that he

9

could follow the law, he also testified that he was "not positive" that he could vote for death, would "heavily lean" in favor of life, and that it would be "almost impossible" for him to vote for death. "Even if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a juror's equivocation 'about whether he would take his personal biases into the jury room' sufficient to substantially impair his duties as a juror, allowing a strike for cause." *State v. Ellison*, 213 Ariz. 116, 137 ¶ 89, 140 P.3d 899, 920 (2006) (quoting *Glassel*, 211 Ariz. at 48 ¶ 49, 116 P.3d at 1208). Here, the trial court could have reasonably concluded that Juror O.'s performance would be substantially impaired by his feelings about capital punishment. *See State v. Montaño*, 204 Ariz. 413, 422-23 ¶¶ 38-39, 65 P.3d 61, 70-71 (2003).

   C.  *Batson* Challenge

¶20    Garcia argues that the trial court erred during selection of the second jury by denying his *Batson* challenge to the State's strike of Juror R., a woman with a Hispanic surname who had limited education and difficulty reading English.

¶21    The exclusion of a potential juror on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Batson* challenges are subject to a three-step analysis: "(1) the party challenging the strike must make a prima facie showing of

10

discrimination; (2) the striking party must provide a race-neutral reason for the strike; and (3) if a race-neutral explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful racial discrimination."  *State v. Cañez*, 202 Ariz. 133, 146 ¶ 22, 42 P.3d 564, 577 (2002).  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

**¶22**       "We review a trial court's decision regarding the State's motives for a peremptory strike for clear error."  *State v. Roque*, 213 Ariz. 193, 203 ¶ 12, 141 P.3d 368, 378 (2006).  We defer to the trial court's ruling, which is based "largely upon an assessment of the prosecutor's credibility."  *Id.* (quoting *Cañez*, 202 Ariz. at 147 ¶ 28, 42 P.3d at 578).

**¶23**       During voir dire, the State twice moved to strike Juror R. for cause on the ground that she could not read English.  The trial court denied both strikes, stating that it could accommodate Juror R. and she could be a productive juror.  When the State later peremptorily struck Juror R., defense counsel made a *Batson* challenge.

**¶24**       The State responded by noting that Juror R. lacked a high school education; had been at her current job for only a year, indicating a lack of stability in the community; had

11

problems understanding the juror questionnaire and what was being said in court; and could not read. The trial court denied the *Batson* challenge. After the final jury members were announced, the trial court noted that two or three of the selected jurors appeared to have Hispanic names.

¶25     The State argues that Garcia failed to make a prima facie showing of discrimination, but this issue is moot. The State offered a race-neutral explanation without the trial court making, or the State requesting, an explicit finding on the issue of prima facie discrimination. "Once [the State] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether [Garcia] had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

¶26     The State, however, satisfied the second step of the *Batson* analysis, which focuses solely on the "facial validity of the [State]'s explanation." *Id*. The explanation given need only be race-neutral or "based on something other than the race of the juror." *Id*. Here, the State offered several facially valid, race-neutral explanations for striking Juror R.

¶27     The third step in the *Batson* analysis is "fact intensive and . . . the trial court's finding at this step is due much deference." *State v. Newell*, 212 Ariz. 389, 401 ¶ 54,

12

132 P.3d 833, 845 (2006).  We will not second-guess the trial court's credibility determination, especially when, as here, both parties agree that at least one juror with a Hispanic surname was ultimately chosen.  *See Roque*, 213 Ariz. at 204 ¶ 15, 141 P.3d at 379 (noting that "[a]lthough not dispositive, the fact that the state accepted other [minority] jurors on the venire is indicative of a nondiscriminatory motive").

### III.   Mistrial after Juror Misconduct

¶28      The trial court ordered a mistrial of the aggravation phase after a juror disclosed a potential incident of juror misconduct on the first day of that phase of the trial.  Garcia now argues that the trial court erred by failing to sua sponte declare a mistrial of the guilt phase.  We review a trial court's ruling on alleged juror misconduct for abuse of discretion.  *State v. Dann*, 220 Ariz. 351, 370 ¶ 106, 207 P.3d 604, 623 (2009).  Moreover, because Garcia failed to object below, he must establish that any error was fundamental in nature and resulted in prejudice.  *State v. Henderson*, 210 Ariz. 561, 567 ¶¶ 19-20, 115 P.3d 601, 607 (2005).

¶29      On the first day of the aggravation phase, Juror P. told the bailiff that she thought members of Garcia's family had improperly contacted her.  She later testified that a Hispanic male had come to her house two or three weeks earlier and asked if she wanted to have weeds pulled from her yard; she said no

13

and he left.  Juror P. said that a very similar-looking Hispanic male appeared at her house the day before the aggravation phase began and asked if she wanted to sell her SUV.  During this conversation, another SUV with a woman and young child inside was parked in front of Juror P.'s house.  Juror P. told the man that she would not sell her SUV and asked him to leave.  As he walked away, Juror P. heard the woman in the SUV say something about "Jeffrey Dalmer [sic] and eating people or something."  On the first day of the aggravation phase, Juror P. noticed a woman sitting on Garcia's side of the audience who looked very similar to the woman she had seen in the SUV.  At lunch, Juror P. told other jurors about both incidents.

¶30    The trial court interviewed Juror P. and the jurors with whom she spoke.  Juror P. said that the first incident did not affect her deliberations in the guilt phase of the trial and that she made a connection to Garcia only when she saw the woman in court.  She confirmed that she had not mentioned either incident to the other jurors until that day.  After the interviews concluded, defense counsel moved for a mistrial of the aggravation phase, which the trial court granted.

¶31    The trial court did not err in failing to sua sponte also grant a mistrial for the already completed guilt phase. When an issue of potential juror misconduct arises, "the court's response should be 'commensurate with the severity of the threat

14

posed.'" *State v. Miller*, 178 Ariz. 555, 557, 875 P.2d 788, 790 (1994) (quoting *United States v. Thomas*, 463 F.2d 1061, 1063 (7th Cir. 1972)). Defense counsel specifically stated that he was seeking only a mistrial of the aggravation phase and not the guilt phase. Moreover, the trial court's decision to grant a mistrial as to the aggravation phase alone was sufficient in light of the limited nature of the potential prejudice. The risk of prejudice arose only after Juror P. connected the incidents to Garcia and told other jurors about them, possibly tainting their perceptions, all of which occurred after the guilt phase.

## IV.    Admission of Prior Act Evidence

¶32    Garcia challenges the trial court's admission, during the aggravation phase, of evidence regarding his having committed an armed robbery in April 2002 at RNR Stix bar. This evidence, he argues, impermissibly suggested that he was a violent person deserving of execution. We review a trial court's evidentiary rulings for abuse of discretion. *State v. McGill*, 213 Ariz. 147, 156 ¶ 40, 140 P.3d 930, 939 (2006).

¶33    Evidence of a defendant's prior acts is inadmissible to prove action in conformity with a character trait. Ariz. R. Evid. 404(b). It may, however, be admitted for other purposes, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*.

15

Before prior act evidence may be presented to a jury, the trial court must find "clear and convincing evidence that the prior . . . act[] [was] committed and that the defendant committed the act[]." *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997). The trial court must also find that the prior act evidence is relevant and that its probative value is not substantially outweighed by unfair prejudice, and the court must give an appropriate limiting instruction upon the defendant's request. *State v. Anthony*, 218 Ariz. 439, 444 ¶ 33, 189 P.3d 366, 371 (2008).

¶34    Here, the State sought to introduce evidence during the aggravation phase that, five weeks before the Harley's robbery, Garcia and Sheffield were involved in another armed robbery and shooting at RNR Stix. This evidence, the State argued, was relevant not only to prove that Garcia had been previously convicted of a serious offense, an aggravator under A.R.S. § 13-751(F)(2), but also to establish his death eligibility. Specifically, because Garcia was charged with felony murder, the State was required to prove that he had been a major participant and had acted "with reckless indifference to human life" in the later robbery at Harley's. *Tison v. Arizona*, 481 U.S. 137, 158 (1987). Over Garcia's objection, the State introduced evidence related to the RNR Stix robbery that included (1) documents and testimony reflecting Garcia's

16

conviction for an armed robbery, (2) testimony from the investigating detective, (3) testimony from a ballistics expert, (4) testimony from the shooting victim, and (5) surveillance video footage of the incident.

¶35 At Garcia's request, the court gave the jury the following limiting instruction before admitting the evidence:

> Evidence of other crimes is about to be presented for purposes of proving Mr. Garcia's degree of participation and individual culpability as it relates to his individual motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident as to the crime of felony murder involving the death of Mr. Johnson. You may consider these acts only if you find that they are going to be proven by clear and convincing evidence that the defendant committed these acts. They are not to be used to prove his bad character or a bad character trait. What they're used for is . . . to make a decision about his level of individual participation and his individual culpability.

¶36 We briefly summarize the evidence admitted regarding the robbery at RNR Stix. Court documents indicated that Garcia had been convicted of an offense that occurred on April 15, 2002; other documents showed that Sheffield had pleaded guilty to attempted murder in connection with an April 15, 2002 incident. These documents alone, however, did not establish that the two men were involved in the same incident. The State called the brother of the victim of the Harley's robbery, who had attended the RNR Stix court proceedings, to testify that

17

both Garcia's verdict and Sheffield's plea concerned the same events.

¶37    The investigating detective testified that he found a shell casing at the RNR Stix crime scene, and the State's ballistics expert opined that this casing and three casings recovered from the Harley's crime scene were shot from the same weapon.  The trial court also admitted surveillance video footage and testimony by the victim of the RNR Stix robbery. The victim testified that on April 15, 2002, two men entered RNR Stix and one of them shot him.  When the victim tried to get up, the non-shooter — whom the victim identified as Garcia — knocked him to the ground, kicked him, took his wallet, and slammed him into a pool table.  The State then played the bar's surveillance videotapes for the jury while the victim described what was happening.  The grainy video showed Garcia taking the victim's wallet while hitting and kicking him.

¶38    The trial court did not abuse its discretion in admitting the evidence regarding the RNR Stix robbery.  The documents reflecting Garcia's conviction for that robbery were admissible to establish the (F)(2) prior conviction aggravator. These documents and the other RNR Stix evidence were also admissible to establish that Garcia acted with "reckless indifference" to human life at the subsequent robbery at Harley's.  The evidence showed that five weeks before the

Harley's robbery, Garcia had participated in another armed robbery in which Sheffield shot someone. The RNR Stix victim's testimony and the video footage show that Garcia did not express surprise or abandon the robbery after Sheffield shot the victim. That Garcia would, within weeks, lead Sheffield into Harley's to commit another robbery with the same weapon is highly probative of Garcia's knowledge that the second robbery posed a grave risk of death to others.

¶39        The trial court here reasonably concluded that the probative value of the evidence was not substantially outweighed by any unfair prejudice and gave the jury a limiting instruction regarding the purposes for which it could be considered. The trial court did not err in admitting this evidence.

## V.        *Enmund/Tison* Finding in Aggravation Phase

¶40        In November 2005, the assigned judge granted Garcia's motion to have the *Enmund/Tison* inquiry resolved in the guilt phase. In February 2007, after the case had been reassigned, another judge reversed the prior ruling and ruled that the *Enmund/Tison* finding would be made in the aggravation phase. After the jury returned its guilty verdict, Garcia moved to bifurcate the aggravation phase so as to resolve the *Enmund/Tison* issue separately from the aggravation issue. The trial court also denied this motion.

¶41        Garcia argues that the trial court violated the "law

of the case" doctrine by ruling that the jury would make the *Enmund/Tison* finding in the aggravation phase. Garcia also contends that even if the *Enmund/Tison* inquiry was properly conducted during the aggravation phase, the trial court still erred by denying his motion to bifurcate the death eligibility and aggravation issues.

¶42 We review a trial court's reconsideration of a prior judge's ruling for abuse of discretion. *State v. King*, 180 Ariz. 268, 279, 883 P.2d 1024, 1035 (1994). Although we have not previously adopted a standard of review for a trial court's denial of a motion to bifurcate an aggravation hearing, we conclude that this decision should also be reviewed for an abuse of discretion. *Cf. Atwood*, 171 Ariz. at 612, 832 P.2d at 629 (reviewing decision on motion to sever for abuse of discretion).

¶43 The second judge did not abuse his discretion by reconsidering the prior judge's decision. Arizona Rule of Criminal Procedure 16.1(d) provides that "[e]xcept for good cause . . . an issue previously determined by the court shall not be reconsidered." This rule and the law of the case doctrine are rules of procedure, not substance; thus, they do not limit a court's "power to change a ruling simply because it ruled on the question at an earlier stage." *King*, 180 Ariz. at 279, 883 P.2d at 1035. Nor do the rules "prevent a different judge, sitting on the same case, from reconsidering the first

judge's prior, nonfinal rulings." *Id.*

¶44    More importantly, in reconsidering the earlier ruling, the second judge properly gave effect to Arizona law, which "specifically requires the trier of fact to make *Enmund/Tison* findings in the aggravation phase." *State v. Garza*, 216 Ariz. 56, 67 ¶ 46, 163 P.3d 1006, 1017 (2007) (citing A.R.S. § 13-752(P) (Supp. 2009)); *Ellison*, 213 at 134-35 n.12 ¶ 72, 140 P.3d at 917-18 n.12.

¶45    Nor did the trial court abuse its discretion in denying Garcia's motion to bifurcate the death eligibility and aggravation issues.  Bifurcation may be appropriate in some cases.  *See*, *e.g.*, *United States v. Fell*, 531 F.3d 197, 239-40 (2d Cir. 2008) (noting that while not required, a number of district courts had "trifurcated" capital proceedings to avoid unfair prejudice to defendants).  Here, however, the trial court's refusal to bifurcate did not unfairly prejudice Garcia. Even if the jury had been asked to separately determine the *Enmund/Tison* issue before finding any aggravating factors, evidence of Garcia's involvement in the RNR Stix robbery would have been admissible in that first phase to establish his reckless indifference to human life.  Thus, the jury would still have heard about the most damning of Garcia's prior convictions during a separate *Enmund/Tison* phase.

¶46    Finally, Garcia contends that resolution of the

*Enmund/Tison* issue during an un-bifurcated aggravation phase violated his constitutional rights. We have previously held that making this determination in the aggravation phase does not violate the Sixth Amendment. *Garza*, 216 Ariz. at 67 ¶ 46, 163 P.3d at 1017. We also reject Garcia's arguments that the process used here resulted in the arbitrary imposition of a death sentence in violation of the Eighth Amendment or denied him due process in violation of the Fourteenth Amendment.

### VI.    *Enmund/Tison* **Instructions**

**¶47**    Garcia argues that the trial court erred by incorrectly defining "major participant" and "reckless indifference" in the *Enmund/Tison* jury instructions. To prevail on this issue, Garcia must establish fundamental error because he did not object to the trial court's final instructions, which modified those that he had proposed. *See Henderson*, 210 Ariz. at 567 ¶¶ 19-20, 115 P.3d at 607.

**¶48**    Garcia requested that the trial court give the Revised Arizona Jury Instructions ("RAJI") Capital 1.0 Degree of Participation Instruction, which included the following language:

> In determining whether the defendant was a "major participant" in the felony, some factors to consider include: the degree to which the defendant participated in the planning of the felony; whether the defendant possessed a weapon or furnished weapons to any accomplice; the degree to which the defendant

22

participated in the felony; and the scope of the defendant's knowledge of the completion of the felony.

A defendant acts with "reckless indifference" to human life when that defendant knowingly engages in criminal activities known to carry a grave risk of death to another human being. The defendant's culpability ultimately rests on whether the defendant was aware or believed that the defendant's acts were likely to result in the death of a person. A finding of "reckless indifference" cannot be based solely upon a finding that the defendant was present at the time of the killing, merely participated in a crime resulting in a homicide or failed to render aid for the victims to call for help.

¶49 The trial court substantially followed Garcia's major participation instruction, but added "whether the defendant reported the crimes" as another factor for the jury to consider. It also condensed the reckless indifference instruction by telling the jury:

A defendant acts with reckless indifference when the defendant knowingly engages in criminal activities that he's aware may likely create a grave risk of death to others. A finding of reckless indifference cannot be based solely on a finding that the defendant was present at the time of the killing or failed to render aid to the victims.

¶50 Garcia first argues that the trial court erred in instructing the jury that it could consider his failure to report the crime in determining if he was a "major participant." Although previous cases may have suggested otherwise, *see State v. Dickens*, 187 Ariz. 1, 23, 926 P.2d 468, 490 (1996) (noting failure to contact authorities among factors supporting finding

23

of major participation), we agree that juries should not be instructed to consider this factor with regard to major participation. This factor may, however, be relevant in determining if a defendant acted with "reckless indifference." *See State v. Lacy*, 187 Ariz. 340, 351, 929 P.2d 1288, 1299 (1996) (finding that failure to render aid or call for help does not alone establish reckless indifference). Garcia's failure to report the robbery after the fact does not bear on his participation in the robbery while in progress, and it was error to instruct the jury otherwise.

¶51    Nevertheless, Garcia has not established that the instruction constituted fundamental error. Identifying the failure to report the crime as one of several factors that the jury could consider in determining if Garcia was a major participant was not an error of fundamental magnitude. Nor has Garcia shown prejudice. The evidence of his major participation included his leading Sheffield into the bar, shouting "drop the money," pushing Johnson up against the wall, and being in close proximity when Johnson was shot to death. Garcia cannot convincingly argue that the jury's finding of major participation rested on his failure to report the crime.

¶52    Garcia also argues that the "reckless indifference" instruction improperly relieved the State of its burden of proving that he subjectively realized that his conduct would

24

likely lead to death. We disagree. The trial court told the jury that "reckless indifference" requires finding that the defendant "knowingly engage[d] in criminal activities that he [was] aware may likely create a grave risk of death to others." The written jury instructions similarly stated that to find "reckless indifference," the jury had to conclude that Garcia "knowingly engage[d] in criminal activities that he [was] aware w[ould] likely create a grave risk of death to others."

## VII. Evidentiary Basis for *Enmund/Tison* Findings

¶53  Garcia argues that the State did not prove the *Enmund/Tison* predicate beyond a reasonable doubt. He contends that he had only a "limited role" in the murder and that his participation in the robbery was insufficient to support the jury's finding.

¶54  We review the jury's *Enmund/Tison* finding for substantial evidence, "viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roseberry*, 210 Ariz. 360, 368-69 ¶ 45, 111 P.3d 402, 410-11 (2005). Substantial evidence exists when there is "such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990) (quoting *State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)).

25

¶55       The Eighth Amendment prohibits imposition of the death penalty unless the defendant "kill[s], attempt[s] to kill, or intend[s] that a killing take place or that lethal force will be employed," *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or is a major participant in the underlying felony and acts with reckless indifference to human life, *Tison*, 481 U.S. at 158. Garcia was convicted under *Tison*; thus, the State had to prove beyond a reasonable doubt that Garcia was a major participant in the crime and was recklessly indifferent to Johnson's life. *See id.* at 158; *State v. Tison*, 160 Ariz. 501, 502, 774 P.2d 805, 806 (1989).

¶56       Substantial evidence supports the jury's finding that Garcia was a major participant in the underlying robbery. He initially entered the bar alone through the front door, which suggests that he was casing the scene. He and Sheffield later entered through the back door and Garcia shouted at Johnson to drop the money. The evidence established that Garcia was "actively involved in every element of the [robbery] and was physically present during the entire sequence of criminal activity culminating in" Johnson's murder. *See Tison*, 481 U.S. at 158.

¶57       Substantial evidence also supports the jury's finding that Garcia acted with reckless indifference to human life. *Tison* characterized such action as "knowingly engaging in

criminal activities known to carry a grave risk of death." 481 U.S. at 157.

¶58    Garcia attempts to analogize his case to *Lacy*, which held that the State had failed to prove reckless indifference beyond a reasonable doubt. 187 Ariz. at 351-53, 929 P.2d at 1299-1301. In *Lacy*, the defendant went to the victims' apartment with his co-defendant to get chemicals to make drugs. *Id.* at 345, 92 P.2d at 1293. While there, his co-defendant argued with the victims and shot one. *Id.* The defendant claimed that he ran out, taking a microwave with him. *Id.* When he re-entered the apartment, his co-defendant had tied up the other victim and was shooting her in the head. *Id.* The defendant stated that he then ran away again, and his co-defendant later picked him up and drove him home. *Id.* Given those facts, we found that there was "little to establish [the defendant's] involvement in the [victims'] deaths," and that without the defendant's testimony, there would be "an almost complete void as to what occurred that night." *Id.* at 352, 929 P.2d at 1300 (noting that it was both unclear whether defendant knew that his co-defendant had a gun and whether he should have anticipated violence). Although the defendant "stole a microwave after one of the murders and did nothing to prevent either victim's death," that conduct alone did not establish reckless indifference. *Id.*

¶59　　　　This case, however, differs in several important respects. First, unlike the defendant in *Lacy*, who accompanied his co-defendant to get drug chemicals and may not have anticipated violence, Garcia accompanied Sheffield to rob a bar. Garcia had every reason to anticipate violence, because he knew Sheffield had shot someone during the RNR Stix robbery just weeks before.

¶60　　　　Second, there is no comparable void in the evidence about what occurred at Harley's. Anderson testified that Garcia led Sheffield into the bar and helped overcome Johnson by pushing him against the wall. A shirt spotted with Johnson's blood was found near the murder scene; a button consistent with one missing from the shirt was found on Johnson's person. The shirt, the parties stipulated, also contained a mixed sample of DNA that was 21,000 times more likely to have come from Garcia and two unknown individuals than from three unknown individuals. This evidence shows that Garcia played an active role in the murder.

¶61　　　　Third, there is no evidence that Garcia attempted to flee at any point during the course of events. Indeed, the evidence showed that he continued to act in concert with Sheffield after the murder.

¶62　　　　Viewing the facts in the light most favorable to sustaining the verdict, we conclude that substantial evidence

28

supports the jury's finding that Garcia was a major participant in the robbery and acted with reckless indifference to human life. *Cf. State v. Bearup*, 221 Ariz. 163, 166, 171-72 ¶¶ 3, 37-43, 211 P.3d 684, 687, 692-93 (2009) (rejecting *Lacy*-based argument when defendant accompanied others to commit violent crime and evidence established his role in events leading up to and following murder).

## VIII.  (F)(5) Aggravator

¶63      Garcia argues that the evidence was insufficient to support the (F)(5) pecuniary gain aggravator.  This claim is subsumed within our independent review.  *See State v. Andriano*, 215 Ariz. 497, 506 n.5 ¶ 41, 161 P.3d 540, 549 n.5 (2007).

## IX.      Constitutionality of Burden of Proof at Sentencing

¶64      Garcia argues that Arizona's death penalty scheme is unconstitutional because it does not require the State to prove beyond a reasonable doubt that a mitigating circumstance, once proven by the defendant, is not sufficiently substantial to call for leniency.  We have previously rejected this argument.  *See Moore*, 222 Ariz. at 20 ¶¶ 110-13, 213 P.3d at 169.

## X.      Juror Replacement in Penalty Phase

¶65      Garcia challenges the trial court's decision to release a juror after the aggravation phase and replace him with an alternate.  He argues that the court failed to determine whether the alternate juror agreed with the jury's earlier

findings, and that he was thus deprived of his right to a unanimous verdict on death eligibility and aggravation. Garcia further contends that the juror replacement impermissibly allowed the alternate juror to shift responsibility for the ultimate verdict to the replaced juror.

¶66    We review a trial court's dismissal of a juror for abuse of discretion. *Roseberry*, 210 Ariz. at 371 ¶ 63, 111 P.3d at 413.   Garcia's constitutional claims are reviewed de novo. *State v. Pandeli*, 215 Ariz. 514, 521 ¶ 11, 161 P.3d 557, 565 (2007).

¶67    At the close of the aggravation phase, the trial court designated four jurors as alternates.   That afternoon, the jury found that the State had proved two aggravators and that Garcia was death-eligible under *Tison*.   The alternates did not participate in this decision.   On the first day of the penalty phase, a juror called in sick and was excused by the State and defense counsel.   Before the jury retired to deliberate, the court designated one of the alternates, Juror Sixteen, to deliberate with the panel on the penalty phase issues.

¶68    Garcia first argues that the trial court abused its discretion in releasing the sick juror and replacing him with Juror Sixteen.   Although it is "preferable to complete a defendant's trial with the same jury that began it," *Roseberry*, 210 Ariz. at 372 ¶ 69, 111 P.3d at 414, Garcia is "not

constitutionally entitled to have the same jury" render verdicts in each phase, *id*. Arizona Rule of Criminal Procedure 18.5(i) provides that "[i]n the event a deliberating juror is excused during the aggravation or penalty phases due to inability . . . to perform required duties, the court may substitute an alternate juror . . . to join in the deliberations." The newly constituted jury need not "deliberate anew about a verdict already reached and entered." *Id.* Only if the juror substitution occurs during actual deliberations must the jurors "begin anew for the phase of the sentencing that they are currently deliberating." *Id.; see also Roseberry*, 210 Ariz. at 373 ¶ 72, 111 P.3d at 415.

¶69    The trial court's dismissal of the flu-stricken juror thus comported with Rule 18.5(i). Not only did the court properly replace the juror with an alternate, it correctly determined that the newly constituted jury was not required to revisit the questions of death eligibility under *Tison* or aggravation. A verdict had already been entered in the aggravation phase, and the penalty phase jury was not required to deliberate anew on these issues. *Cf*. A.R.S. § 13-752(K) (providing that jury newly impaneled during penalty phase shall not retry issues of guilt or aggravation determined by prior jury).

¶70    Nor was the trial court required to ascertain whether

31

Juror Sixteen agreed with the jury's prior findings. In *Roseberry*, we noted that the trial court "took precautions to ensure that Juror Twelve, the alternate who replaced Juror Eight, was able to deliberate for the penalty phase," by allowing the State to ask Juror Twelve a series of questions to establish his understanding that (1) the jury had deliberated without him, (2) the jury had previously found the defendant guilty, (3) the jury had also found aggravating circumstances, and (4) those verdicts had to be his as well. 210 Ariz. at 372 ¶ 67, 111 P.3d at 414.

¶71    Contrary to Garcia's assertion, our decision in *Roseberry* does not require a trial court to engage sua sponte in a similar dialogue with an alternate juror, nor does it suggest that an alternate's agreement with a jury's earlier findings is a prerequisite to deliberation. And, while it may be wise for a court to discuss with an alternate juror his role in the proceedings, Juror Sixteen was well aware that his duty was to deliberate on sentencing alone. In its instructions, the trial court reminded the jury that "in the guilt phase of [the] trial, [Garcia] was found guilty of first degree murder," and that in the aggravation phase, two aggravators were found to exist. The sentencing phase jury, including Juror Sixteen, thus had a duty to determine only "whether [Garcia] should be sentenced to life imprisonment or death for his conviction of first degree

murder." These instructions served the same purpose as the State's questions in *Roseberry*: they established that Juror Sixteen was to accept the jury's prior findings as his own and deliberate only on sentencing issues.

¶72 Garcia also argues that because Juror Sixteen did not decide his death qualification in the aggravation phase, he impermissibly abdicated responsibility for his ultimate decision to the juror he replaced. Garcia notes that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985).

¶73 No impermissible shifting of responsibility occurred here. The trial court informed the jurors that their duty was to "determine whether the defendant should be sentenced to life imprisonment or death for his conviction of first degree murder." The court also instructed the jury that its "sentencing decision [wa]s not a recommendation. [Its] decision [would] be binding. If [its] verdict [wa]s that the defendant should be sentenced to death, the defendant [would] be sentenced to death. If [its] verdict [wa]s that the defendant should be sentenced to life, he [would] be sentenced to life." Given these instructions, Juror Sixteen was fully aware that he bore

responsibility for determining the appropriate sentence. *See also Dann*, 220 Ariz. at 360-61 ¶¶ 29-30, 207 P.3d at 613-14 (rejecting defendant's argument that use of different sentencing jury "improperly shifted responsibility between the two juries" because the second sentencing jury "received clear instruction that it alone would determine the appropriate sentence").

**XI.    Penalty Phase Jury Instructions**

¶74      Garcia argues that the trial court erred in rejecting three of his proposed penalty phase instructions.   Garcia requested instructions (1) stating that he would not be eligible for parole until he had served at least 53.6 years in prison; (2) informing jurors of their duty to discuss the case and deliberate, but noting that jurors should not change their honest beliefs solely because of fellow jurors' opinions or "for the mere purpose of returning a verdict"; and (3) defining relatively minor participation and stating that it is a mitigating circumstance.

¶75      We review a trial court's refusal to give a jury instruction for abuse of discretion. *State v. Martinez*, 218 Ariz. 421, 432 ¶ 49, 189 P.3d 348, 359 (2008).   We review the "legal adequacy" of an instruction de novo. *Id.*   "In assessing the adequacy of jury instructions, the instructions must be viewed in their entirety in order to determine whether they accurately reflect the law." *State v. Hoskins*, 199 Ariz. 127,

145 ¶ 75, 14 P.3d 997, 1015 (2000).  Additionally, "when the substance of a proposed instruction is adequately covered by other instructions, the trial court is not required to give it." *Id.*

**¶76**    The trial court did not abuse its discretion in refusing to instruct the jury that Garcia would not be eligible for parole for 53.6 years.  An instruction on parole eligibility must be given only when (1) the defendant's life sentence carries no possibility of parole, and (2) the State argues that the defendant's future dangerousness militates in favor of the death penalty.  *Simmons v. South Carolina*, 512 U.S. 154 (1994); *see also Kelly v. South Carolina*, 534 U.S. 246, 251-52 (2002) (clarifying that *Simmons* applies even if an allegation of future dangerousness is made solely as "a logical inference from the evidence").

**¶77**    Here, the trial court was not required to give an instruction on parole eligibility because, irrespective of any likelihood that he would die in prison, Garcia was not technically ineligible for parole.  *See Simmons*, 512 U.S. at 168 (noting that when parole is available, the Court will not "lightly second-guess a decision whether or not to inform a jury of information regarding parole").  Moreover, the State did not emphasize Garcia's future dangerousness.  The State did not ask the jury to return a death verdict for reasons of "self-

35

defense," *see Simmons*, 512 U.S. at 157, nor did it implicitly indicate that Garcia would pose a threat if he were someday released from prison, *see Kelly*, 534 U.S. at 248–50. Rather, the State primarily argued that Garcia had been presented with chances to "get himself straightened out," and that any mitigation he offered did not excuse his conduct.

¶78        Furthermore, the trial court instructed the jury that Garcia "face[d] . . . a minimum sentence of 38.85 years," and Garcia repeatedly told the jury that he was facing decades of prison time before parole became an option. Thus, the jury received sufficient information from which it could conclude that Garcia would likely die in prison. The trial court did not err in refusing this instruction.

¶79        The trial court also did not abuse its discretion in refusing to instruct jurors that they had a duty to deliberate, but should not change their honest beliefs merely to return a verdict. The verdict form itself had an option for "no unanimous agreement," which sufficiently communicated to the jury that it was not required to reach a verdict. Moreover, the trial court's instructions emphasized that the each juror should make an individual decision as to the sufficiency of Garcia's mitigation evidence in determining the proper sentence.

¶80        Finally, the trial court did not abuse its discretion in refusing to give an instruction defining relatively minor

participation and stating that it is a mitigating circumstance. We rejected a similar argument in *Johnson*. 212 Ariz. at 436-38 ¶¶ 41-47, 133 P.3d at 746-48. Because the Supreme Court has emphasized that there must be a "broad inquiry into all relevant mitigating evidence to allow an individualized determination," *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), we noted that "direct[ing] or permit[ting] trial courts to give potentially confining mitigation instructions" could result in a "significant danger," 212 Ariz. at 437 ¶ 43, 133 P.3d at 747, and "would be inharmonious with the Supreme Court's admonitions that the sentencer be free to consider *any* relevant mitigating factor," *id.* at 437 ¶ 47, 133 P.3d at 747 (quoting *Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir. 1984)).

¶81 The trial court here properly instructed the jurors that they could consider any relevant factor as mitigating. Garcia was permitted to argue that he was a relatively minor participant; indeed, it was a theme of his penalty phase closing argument. *See Johnson*, 212 Ariz. at 437 n.11 ¶ 47, 133 P.3d at 747 n.11 (finding no abuse of discretion when defense counsel "argued the presence of specific mitigating circumstances not elaborated by the final penalty phase jury instructions").

XII.    **Propriety of Death Sentence**

¶82 Garcia argues that this Court should review the propriety of his death sentence under an analysis similar to

37

that employed in *Roper v. Simmons* and *Atkins v. Virginia*. *Roper*, 543 U.S. 551 (2005) (categorically excluding defendants under eighteen years old from death eligibility); *Atkins*, 536 U.S. 304 (2002) (categorically excluding mentally retarded defendants from death eligibility).  He contends that such an analysis compels the categorical exclusion of non-shooters from death eligibility in felony murder cases.

¶83    We disagree.  In *Tison*, the Supreme Court explicitly approved the imposition of death sentences on persons who do not themselves kill but who act with reckless indifference to human life and are major participants in criminal activities that result in death.  481 U.S. at 158.  *Cf. Kennedy v. Louisiana*, 128 S. Ct. 2641, 2650 (2008) (noting that in *Tison* the Court "allowed the defendants' death sentences to stand where they did not themselves kill the victims but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial").  We also reject Garcia's suggestion that a death sentence is constitutionally barred because Sheffield was the actual shooter and ultimately received a natural life sentence.

## XIII.   Denial of Exhibit Review during Deliberations

¶84    Garcia argues that the trial court fundamentally erred by denying the jury's request to review Exhibit 203 during penalty phase deliberations.  We review for fundamental error,

38

as Garcia did not object below. *See Henderson*, 210 Ariz. at 567 ¶¶ 19-20, 115 P.3d at 607.

¶85    The record reflects some confusion regarding Exhibit 203. During the penalty phase, the State introduced two exhibits while cross-examining Garcia's mitigation specialist. The exhibits, marked as 201 and 203, were presentence reports from Garcia's prior cases. Both exhibits were used solely for impeachment and neither was admitted. Later that day, the trial court issued a minute entry renumbering Exhibit 203 as Exhibit 202. The next day, defense counsel questioned a witness about Sheffield's participation in a murder at a liquor store after Garcia's arrest. During this testimony, defense counsel introduced a copy of Sheffield's plea agreement for the murder in that case. The plea agreement was marked as Exhibit 203 and admitted into evidence.

¶86    Less than thirty minutes after it began deliberating, the jury requested Exhibits 201 and 203. The trial court denied the request, stating that those exhibits had not been admitted. Neither attorney objected. The trial court was mistaken, because although the exhibit first marked as 203 (a presentence report) was not admitted, another exhibit (Sheffield's plea agreement) was later numbered Exhibit 203 and admitted.

¶87    Nonetheless, the trial court's refusal to submit Exhibit 203 to the jury was not fundamental error because Garcia

39

cannot show prejudice. He was able to present ample evidence that Sheffield had committed another murder and had made non-death sentence plea deals for that crime and the RNR Stix incident. Exhibit 197, which detailed Sheffield's sentences for both crimes, was admitted into evidence. Detective Rodriguez testified that Garcia was in custody when Sheffield committed the liquor store murder and that Sheffield took a plea bargain in that case. Garcia told the jury in his closing argument that the State had "dropped the death penalty" against Sheffield and that his solo conviction for a subsequent murder established that Garcia was a minor participant in the Harley's murder.

## XIV. Independent Review

¶88 Because the murder occurred before August 1, 2002, we independently review aggravation, mitigation, and the propriety of Garcia's death sentence.[3] A.R.S. § 13-755(A) (Supp. 2009); *see also* 2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.).

A. Aggravating Circumstances

1. A.R.S. § 13-751(F)(2) — Prior Conviction

---

[3] Garcia also asks this Court to treat the *Enmund/Tison* finding as it would an aggravating circumstance and subject it to independent review. We have, however, previously noted that "*Enmund/Tison* findings are not aggravators, and, consequently, are not subject to our independent review." *Ellison*, 213 Ariz. at 135 n.13 ¶ 73, 140 P.3d at 918 n.13 (internal citations omitted).

¶89 Under A.R.S. § 13-751(F)(2), an aggravating circumstance exists if "[t]he defendant has been or was previously convicted of a serious offense." The State proved this aggravator beyond a reasonable doubt by introducing documents reflecting Garcia's prior convictions for sexual assault and armed robbery.

2. A.R.S. § 13-751(F)(5) — Pecuniary Gain

¶90 Under A.R.S. § 13-751(F)(5), an aggravating circumstance exists if "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." Our inquiry is "highly fact-intensive." *State v. Ring*, 204 Ariz. 534, 560 ¶ 76, 65 P.3d 915 941 (2003).

¶91 To establish the (F)(5) aggravator, the State must establish that "pecuniary gain was a 'motive, cause, or impetus for the murder and not merely the result.'" *Cañez*, 202 Ariz. at 159 ¶ 91, 42 P.3d at 590 (quoting *State v. Kayer*, 194 Ariz. 423, 433 ¶ 32, 984 P.2d 31, 41 (1999)). Aggravation based on pecuniary gain "does not require a motive to kill . . . [but] may also be based upon a causal connection between the pecuniary gain objective and the killing." *Cañez*, 202 Ariz. at 159 ¶ 93, 42 P.3d at 590. The ultimate inquiry is "whether a motive for the murder was to facilitate the taking of or the ability to keep items of pecuniary value." *State v. Sansing (Sansing I)*,

41

200 Ariz. 347, 354 ¶ 15, 26 P.3d 1118, 1125 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

¶92     Here, the (F)(5) aggravator was proven beyond a reasonable doubt. Garcia led Sheffield, gun drawn, into the bar where Johnson was kneeling in front of the ATM. Garcia could have seen Johnson and the ATM from outside the bar's back door. When Johnson shouted "get out" at the intruders, Garcia pushed him against the wall. Anderson heard "scuffling" as he escaped the bar. Johnson's body was found outside on the back patio, although he had been inside when Anderson last saw him. His body was surrounded by $20 bills, some of them crumpled. Johnson's wife testified that Johnson was not someone who would "back away" if threatened, and the medical examiner testified that Johnson had wounds on his body that were consistent with an altercation. A shirt was found near the crime scene that was spotted with Johnson's blood and was missing a button. A button consistent with the missing button was found near Johnson's body. Also on the shirt was a mixed sample of DNA that was 21,000 times more likely to have come from Garcia and two unknown individuals than from three unknown individuals.

¶93     Moreover, Anderson's testimony indicates that the murder and robbery happened in a short time; indeed, he heard two gunshots before he escaped the bar. We have noted that when "the killing and robbery take place almost simultaneously, we

42

will not attempt to divine the evolution of the defendant's motive in order to discern when, or if, his reason for harming the victim shifted from pecuniary gain to personal 'amusement' or some other speculative nonpecuniary drive." *Cañez*, 202 Ariz. at 160 ¶ 96, 42 P.3d at 591.

¶94      Considered in its totality, the evidence establishes beyond a reasonable doubt that Garcia's participation in the murder was motivated by the expectation of pecuniary gain, even if we assume that Sheffield rather than Garcia shot Johnson.

### B. Mitigating Circumstances

#### 1. A.R.S. § 13-751(G)(3) — Minor Participation

¶95      Under A.R.S. § 13-751(G)(3), a mitigating circumstance exists where "[t]he defendant was legally accountable for the conduct of another . . . but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." Garcia has failed to establish that he was a minor participant. Even if we focus solely on Garcia's participation in the murder itself rather than the robbery, circumstantial evidence established that he was actively involved.

#### 2. Sentencing Disparity

¶96      On October 1, 2007, after jury selection for a joint trial had begun, Garcia's and Sheffield's trials were severed because of Sheffield's poor health. Sheffield suffered from

43

end-stage liver disease and had become disoriented after falling in his cell.  At Garcia's trial in December 2007, the State confirmed that Sheffield was scheduled to begin trial in January 2008 and that it was seeking the death penalty.

¶97     On the eve of Sheffield's trial, Correctional Health Services requested shorter trial days so that it could closely monitor Sheffield's health.  Subsequently, the trial court announced that it would hold trial from 1:00 to 4:30 p.m. daily and that it anticipated that the trial would last through May 2008.  On January 15, 2008, Sheffield entered into a natural life plea agreement.  He died on February 26, 2008.

¶98     "A disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance if no reasonable explanation exists for the disparity."  *Kayer*, 194 Ariz. at 439 ¶ 57, 984 P.2d at 47.  Although the record does not detail the State's reasons for entering the plea agreement with Sheffield, we do not believe that the resulting sentencing disparity deserves significant weight as a mitigating factor.

¶99     When the jury determined in December 2007 that Garcia should be sentenced to death, it was not under any misimpression about Sheffield's status.  The jury was never told that Sheffield *would* receive a death sentence in this case; it was told only that he *could* after a future trial.  The jury was also informed that Sheffield had already received a life sentence for

44

the liquor store murder he committed after Garcia's arrest.

¶100    Although the State never made explicit its reasons for offering Sheffield a plea, its decision is well-supported by the record.  When Sheffield pleaded guilty, his health had declined to the point where he could not attend court for more than a few hours a day.  His trial would have taken months to conclude and indeed, had he gone to trial, he would have died long before its projected conclusion.  Under these circumstances, the sentencing disparity does not merit significant mitigating weight.

### 3. Remorse

¶101    Garcia's former girlfriend testified that after Johnson's murder, she saw Garcia's picture on TV and asked him if he "did it."  Garcia said no and started crying.

¶102    Garcia has not established remorse as a mitigating factor.  When apprehended, Garcia was not remorseful, but instead attempted to flee after cursing and making an obscene gesture at the police officer, who had to shoot Garcia to capture him.  Garcia has consistently denied involvement in Johnson's murder, and we have previously rejected remorse as mitigation when the defendant continues to deny responsibility. *See, e.g.*, *Dann*, 220 Ariz. at 376 ¶¶ 150-51, 207 P.3d at 629; *Andriano*, 215 Ariz. at 512 ¶ 76, 161 P.3d at 555.

### 4. Drug Addiction

¶103    Garcia    presented    evidence    that    he    began    using

45

marijuana and drinking alcohol at an early age. He later began using heroin and crack cocaine. Within one month of his January 2001 release from prison for a prior offense, he tested positive for opiates and was returned to prison.

¶104    Garcia has established his drug addiction; however, we give minimal weight to this mitigator because he has "failed to tie his . . . drug abuse to the crime or to his mental functioning" when the murder occurred. *Pandeli*, 215 Ariz. at 532 ¶ 75, 161 P.3d at 575.

### 5. Dysfunctional Childhood

¶105    Garcia presented evidence that his father, Alfredo Garcia, Sr., was a heroin dealer who used drugs in front of his children. The neighborhood feared him. He was often drunk and terrorized his family, sometimes "shoot[ing] up the house." He once hung Garcia on a hook and stabbed him with a screwdriver because he was not tough enough. Alfredo Sr. maintained another household with a girlfriend and spent increasing time away from his family. Garcia and his siblings often went hungry. When his father passed out, Garcia would steal money from him and give it to his mother for groceries.

¶106    Garcia began his numerous encounters with the juvenile justice system at age twelve. At fifteen, he was placed at the Arizona Boys Ranch. He dropped out of school in ninth grade, but eventually earned his GED. When Garcia was eighteen, his

46

father was murdered, an event Garcia said was "very painful."

¶107 "A difficult family background may be a mitigating circumstance in determining whether a death sentence is appropriate; however, we give this factor little weight absent a showing that it affected the defendant's conduct in committing the crime." *Moore*, 222 Ariz. at 22 ¶ 128, 213 P.3d at 171. We give this factor little weight here because Garcia was thirty-nine at the time of Johnson's murder and no evidence linked his childhood experiences to the murder. *Cf. Ellison*, 213 Ariz. at 144 ¶ 136, 140 P.3d at 927 (noting that "[the defendant's] childhood troubles deserve[d] little value as a mitigator for the murders he committed at age thirty-three").

### 6. Lack of Future Dangerousness

¶108 Garcia argues that he poses no risk of future dangerousness because he will never be released from prison. A defendant's reliance on the mere fact that he will be incarcerated provides no more than "minimal weight" for mitigation purposes. *See State v. Sansing* (*Sansing II*), 206 Ariz. 232, 241 ¶ 37, 77 P.3d 30, 39 (2003).

### C. Propriety of Death Sentence

¶109 After evaluating each aggravating and mitigating circumstance, we must independently review the propriety of the death sentence. *See* A.R.S. § 13-755(A). In doing so, "we consider the quality and the strength, not simply the number, of

aggravating and mitigating factors." *Roque*, 213 Ariz. at 230 ¶ 166, 141 P.3d at 405 (internal quotations omitted).

**¶110** Here, both the (F)(2) and (F)(5) aggravators are established beyond a reasonable doubt, and Garcia's mitigation evidence is not sufficiently substantial to warrant leniency.

## XV. Issues Preserved for Federal Review

**¶111** To avoid preclusion, Garcia raises twenty-seven additional constitutional claims that he states have been rejected in previous decisions by the Supreme Court or this Court. The attached Appendix lists these claims and the decisions Garcia identifies as rejecting them.

### CONCLUSION

**¶112** For the foregoing reasons, we affirm Garcia's convictions and sentences.

_____
W. Scott Bales, Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
A. John Pelander, Justice

48

**APPENDIX**

(1) The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

(2) Execution by lethal injection is *per se* cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

(3) The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and *no* mitigating circumstances exist. *Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

(4) The death penalty is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440 ¶ 69, 133 P.3d 735, 750 (2006).

(5) The statute unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

(6) Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

(7) Arizona's death statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645-46 n.21(4), 832 P.2d 593, 662-63 n.21(4) (1992).

(8) Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence. *State v. Greenway*, 170 Ariz. 151, 164, 823 P.2d 22, 31 (1991).

49

(9) The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *State v. Cromwell*, 211 Ariz. 181, 192 ¶ 58, 119 P.3d 448, 459 (2005).

(10) Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian. *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

(11) The Constitution requires a proportionality review of a defendant's death sentence. *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

(12) Subjecting Garcia to a second trial on the issue of aggravation and punishment before a new jury violates the double jeopardy clause of the Fifth Amendment. *State v. Ring* (*Ring III*), 204 Ariz. 534, 550 ¶ 39, 65 P.3d 915 (2003).

(13) Garcia's death sentence is in violation of his rights to a jury trial, notice and due process under the Fifth, Sixth, and Fourteenth Amendments since he was not indicted for a capital crime. *McKaney v. Foreman*, 209 Ariz. 268, 271 ¶ 13, 100 P.3d 18, 21 (2004).

(14) Imposition of a death sentence under a statute not in effect at the time of Garcia's trial violates due process under the Fourteenth Amendment. *State v. Ellison*, 213 Ariz. 116, 137 ¶ 85, 140 P.3d 899, 920 (2006).

(15) The reasonable doubt jury instruction at the aggravation trial lowered the State's burden of proof and deprived [Garcia] of his right to a jury trial and due process under the Sixth and Fourteenth Amendments. *State v. Dann* (*Dann I*), 205 Ariz. 557, 575-76 ¶ 74, 74 P.3d 231, 249-50 (2003).

(16) Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Garcia to prove mitigation is "sufficiently substantial to call for leniency." *State v. Glassel*, 211 Ariz. 33, 52 ¶ 72, 116 P.3d 1193, 1212 (2005).

(17) The failure to provide the jury with a special verdict on Garcia's proffered mitigation deprived him of his rights to not be subject to ex post facto legislation and right to

50

meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373 ¶ 74 & n.12, 11 P.3d 402, 415 & n.12 (2005).

(18) The trial court improperly omitted penalty phase instructions that the jury could consider mercy or sympathy in evaluating the mitigation evidence and determining whether to sentence Garcia to death. *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

(19) Arizona's current protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, 510 ¶¶ 61-62, 161 P.3d 540, 553 (2007).

(20) The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, 139 ¶¶ 101-02, 140 P.3d 899, 922 (2006).

(21) The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth, and Fourteenth Amendments. *State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, 487-88 ¶¶ 47-50, 189 P.3d 403, 414-15 (2008).

(22) The refusal to permit *voir dire* of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Garcia's rights under the Sixth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 440 ¶¶ 29-35, 133 P.3d 735, 750 (2006).

(23) The refusal to permit Garcia to argue or the jury to consider whether his death sentence would be proportional to other similarly situated defendants violated his rights under the Eighth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 431-32 ¶¶ 19-20, 133 P.3d 735, 750 (2006).

(24) The refusal to permit evidence regarding a sentence of life without parole and ineligibility of any future release deprived Garcia of his rights under the Eighth and Fourteenth Amendments. *State v. Cruz*, 218 Ariz. 149, 160 ¶¶ 40-45, 181 P.3d 196, 207 (2008).

51

(25) Subjecting Garcia to sentencing before a jury that did not decide his guilt deprives him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments since his guilt trial jury was organized to convict and his sentencing jury was organized solely to impose a death sentence. *State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, 483-84 ¶¶ 17-25, 189 P.3d 403, 410-11 (2008).

(26) The failure to instruct the jury that the State bore the burden of proving its rebuttal to mitigation evidence beyond a reasonable doubt violated Garcia's rights under the Sixth, Eighth, and Fourteenth Amendments. *State v. Roque*, 213 Ariz. 193, 225-26 ¶¶ 138-40, 141 P.3d 368, 400-01 (2006).

(27) The penalty phase jury instructions that advised the jury it "must" return a death sentence in various circumstances and forms of verdict impermissibly shifted the burden of proof to Garcia and created a presumption of death. *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 317 ¶¶ 70-73, 160 P.3d 177, 196 (2007).